IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| JAIME COVARRUBIAS | § | |
|---|---|---|
| v. | § | CIVIL ACTION NO. 6:13cv812 |
| TODD FOXWORTH, ET AL. | § | |

<u>MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE</u>

The Plaintiff Jaime Covarrubias, proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged deprivations of his constitutional rights. This Court ordered that the case be referred to the United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

**I. Background**

Covarrubias' original complaint was some 90 pages long and raised 19 separate and distinct claims. These concern: (1) disciplinary cases; (2) sleep deprivation; (3) medical care; (4) mail delivery; (5) meals; (6) ventilation; (7) idleness; (8) sanitation; (9) property; (10) grievances; (11) classification; (12) maintenance; (13) law library policies; (14) close custody overflow; (15) double-celling; (16) typewriters; (17) harassment; (18) retaliation; and (19) strip searches. Of these, claims no. 1, 2, 4, 5, 7, 9, 10, 11, 14, 15, and 16 have been dismissed and Covarrubias has filed an amended complaint setting out his remaining claims.

After an evidentiary hearing, the Magistrate Judge issued a Report recommending that all of the claims except for the strip search conducted by Officer Mapps be dismissed. The Magistrate Judge also issued a separate Report recommending that the dismissal of the sleep deprivation claim

1

be set aside and that claim reopened. Covarrubias filed objections to the first of these Reports, and no objections have been filed to the second Report.

The Magistrate Judge withdrew the two Reports for purposes of consolidation and judicial economy and issued the Report currently under consideration. Covarrubias has filed objections to the most recent Report.

## II. Medical Care

Covarrubias stated that he complained of various conditions to Nurse Practitioner Melvin Wright and Dr. Clayton, including restlessness, aching knees, constipation, headaches, vertigo, momentary blackouts, poor concentration, and depression, but Wright told him that "we only treat symptoms." Dr. Clayton told Covarrubias that TDCJ permits medical personnel only to reduce symptoms and that budget concerns do not allow for tests until "a serious state is apparent." Dr. Clayton and Nurse Wright, along with an unidentified individual, failed to diagnose that Covarrubias was suffering from sleep deprivation and forced him to endure pain, discomfort, anxiety, depression, and insomnia.

On July 4, 2013, Covarrubias states that he informed Nurse Practitioner Schafer that he was suffering from nocturnal sweats, inability to breathe, gasping, itching, and thirst. She had him perform a breath test and listened to his body with a stethoscope, but told him "oh, it's the heat, it happens to me too, sometimes I feel like I can't breathe." Covarrubias contends that medical staff assumes prisoners are malingering and complains that Shafer's failure to perform the proper tests, failure to diagnose his ailment, and refusal to treat him was "reckless and/or negligent." Covarrubias also complained that he was assigned to close custody from July of 2013 to October of 2014 and during this time, he was chaperoned by two correctional officers on every visit to the infirmary. These officers never left the examination room, meaning that at no time did Covarrubias have the opportunity to visit privately with medical staff or discuss confidential, personal, or intimate matters with them. He concedes that TDCJ requires staff members sign a confidentiality agreement, but argues that the policy of requiring escorts to remain with the inmate results in refusals to obtain

medical care, invade his privacy, violate state confidentiality laws, and amount to medical malpractice.

The Magistrate Judge reviewed Covarrubias' pleadings, testimony, and medical records and determined that his claims did not rise to the level of deliberate indifference to serious medical needs. *See Domino v. TDCJ-ID*, 239 F.3d 752, 756 (5th Cir. 2001) (deliberate indifference is "an extremely high standard to meet" and requires a showing that officials refused to treat prisoner, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct clearly evincing wanton disregard for serious medical needs).

In his objections, Covarrubias argues that Dr. Clayton, Nurse Wright, and others "created, enforced, or applied a policy or custom that prevents the diagnosis of a serious medical condition." They also provided inadequate medical care in that they did not diagnose that he was suffering from sleep deprivation. Although the Magistrate Judge determined this claim alleged no more than negligence, Covarrubias argues that this conclusion is not supported by the record. He states that he suffered from high blood pressure causing momentary blackouts and "surges to the brain," the cause of which was never determined.

Covarrubias asserts that the defendant medical officials were "apathetic and reckless" in their treatment of him, as shown by their cursory examinations. He argues that whether his symptoms amount to a serious medical need requires further assessment by an experienced medical professional and an evaluation of medical standards. Covarrubias maintains that the medical defendants did not want to discover any medical condition worthy of comment and Dr. Clayton and Nurse Wright were more concerned with what the budget allowed them to do, which shows knowing and intentional disregard for health.

Covarrubias repeats his claim that Nurse Schafer failed to discover a heat-related illness, claiming that his condition was so severe that he feared death. He maintained that the pre-segregation evaluations he received involved only one question, about suicidal impulses. While

these evaluations also involved the taking of vital signs, Covarrubias insists that the taking of vital signs is somehow "irrelevant to heat-induced manifestations."

Covarrubias contends that Nurse Schafer focused on what was apparent or easily determinable but "otherwise held Plaintiff in disregard," pointing to her statement that sometimes she could not breathe. She had him perform a breath test, supposing that the condition he described was somehow discoverable under conditions of no extreme heat, and "made no mention of whether a person who is awakened in the middle of sleep, thirsty, itchy, gasping for breath, covered in sweat, is common and is assured of no permanent injury." He argues that this evaluation was "beyond negligent."

Covarrubias also complains of Schafer's evaluation that he had no tinea, stating that she asked him if he itched and he said yes, but she did not want to examine him until he prompted her to do so. She then concluded that because no tinea was apparent, medication was not available because that was TDCJ policy.

Covarrubias further complains that he was denied "medical privacy" because while he was in close custody, he could not visit the medical staff in private, but was always accompanied by two officers. Although he claims TDCJ policy requires that prisoners receive auditory and visual privacy, Covarrubias states that the staff does not leave the presence of a close custody inmate during the visit with medical personnel.

As a result of this lack of privacy, Covarrubias states that he refused to consult with mental health personnel, even though he was experiencing "severe depression and mental anguish over his circumstances." He argues that the right to confidentiality should prevail for inmates where no legitimate penological purpose is served.

The Magistrate Judge correctly determined that a prisoner's belief that more tests should be conducted or additional diagnostic measures undertaken does not raise a claim to constitutional dimensions. The medical records show he was seen by Schafer on August 5, 2013, at which time examination showed that his heart and lungs were normal, he had no difficulty breathing, and he

had no tinea (a fungal infection commonly called "jock itch") in his groin or feet. Covarrubias also filed a grievance in 2011 complaining that when he told Dr. Clayton about such symptoms as headaches and vertigo, the doctor told him that there was no remedy to eliminate these symptoms entirely and he would have to depend on such medications as ibuprofen or naproxen. The response to the grievance indicated that no objective symptoms were found.

The failure to correctly diagnose a prisoner's ailment does not itself amount to deliberate indifference. *Fenlon v. Quarterman*, 350 F.App'x 931, 2009 U.S. App. LEXIS 23614, 2009 WL 3444778 (5th Cir., October 26, 2009) (failure to diagnose squamous cell cancer on a prisoner's neck was not deliberate indifference); *Lewis v. Evans*, 440 F.App'x 263, 2011 U.S. App. LEXIS 17486, 2011 WL 3669715 (5th Cir., August 22, 2011). Covarrubias' records show that he was seen by medical personnel on a number of occasions, but they did not run the tests he believed necessary or provide the treatment he thought appropriate. The fact that the medical personnel may not have provided the quality and quantity of care which Covarrubias considered proper is not proof of deliberate indifference; in order to set out a claim of deliberate indifference, a prisoner must show that the defendants refused to treat him, intentionally treated him incorrectly, or engaged in any similar conduct clearly evincing a wanton disregard for any serious medical needs. *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Covarrubias has failed to show that Dr. Clayton, Nurse Schafer, or Nurse Wright were deliberately indifferent to his serious medical needs. *See also Stewart v. Murphy*, 174 F.3d 530, 533-34 (5th Cir. 1999) (no deliberate indifference where first treating physician overlooked patient's skin wounds, often did not read nurses' notes, and did not follow up to ensure that his orders were being followed, and second treating physician rejected the recommendation of an outside surgeon to transfer the patient to another facility). Covarrubias' objections in this regard are without merit.

Covarrubias next complains that the Magistrate Judge did not address his claim of denial of privacy "except in passing the facts." The Report determined that prisoners do not have a constitutional right to the confidentiality of their medical records, citing *Anderson v. Romero*, 72

F.3d 518, 523 (7th Cir. 1995), and that the assignment of escorts to inmates in close custody, a classification requiring a high level of security, is rationally related to legitimate penological interests, *citing Thornburgh v. Abbott*, 490 U.S. 401, 407-08, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1988). Covarrubias concedes that TDCJ requires staff members to sign a confidentiality agreement and does not allege that any officer ever violated this agreement with regard to him. He has not shown a constitutional violation in the fact that he was escorted to medical appointments by officers who remained nearby while he was in close custody, which is the most high-security classification in TDCJ other than administrative segregation. These objections are likewise without merit.

**III. Ventilation**

Covarrubias stated that he was on Eight Building between June of 2013 and August of 2014. Sometimes he had his fan but not always, and the cell vents ranged from poorly to fairly blowing; however, cold air is not introduced into the cells. Heat is transferred into the cells from the outside walls. Covarrubias suffered "periods of sweating" and awoke on at least three occasions gasping for breath, even though his personal fan and in-cell vent were operating and the window was ajar. He filed grievances asking that adequate provisions such as air conditioning be implemented because the current procedures, including industrial fans and the provision of ice, were insufficient. Covarrubias contends that the Defendants, including Warden Berger and the maintenance supervisor, were negligent or deliberately indifferent through the use of an inadequate ventilation system.

Covarrubias states that he spent intermittent 30-day periods on 11 Building transient overflow. The vents there functioned poorly, there was an absence of apertures, and inmates in solitary were not permitted to have personal fans. Prisoners received ice two to four times a day and industrial fans operated in the hallway.

The Magistrate Judge initially determined that Covarrubias' claims failed to rise to the level of cruel and unusual punishment, but after the original Reports were withdrawn, the most recent

Report recommended that Covarrubias' claims regarding exposure to excessive heat go forward. Covarrubias' objections did not mention this recommendation.

## IV. Sanitation

Covarrubias contends that he repeatedly complained about the showers being infrequently cleaned and not being sanitized. The exhaust vents were not functioning, the floor drain grates were missing, damaged, or clogged, the walls were porous instead of flat and smooth, and the rooms were "insect infested, odorous, and dark." He states he had a "heat rash" appear on his body around the end of 2012, which lasted for two months, in which he asserts that the blisters formed on his arm after he leaned on the shower wall. Other inmates also suffered "heat rashes," supposedly in the summer months or around them. He acknowledged that he did not seek medical care for this rash. Later medical records show that Covarrubias received treatment for athlete's foot, a common fungal infection on the skin.

With regard to cleaning cells, Covarrubias states that inmates get one paper cone of a cleansing powder called "Bippy" twice a month. Grievance responses state that this is enough to clean an entire cell, but Covarrubias states that while this amount may be enough to wipe down the stainless steel lavatory and wall, it is not enough to clean the table, shelves, lockers, or floor.

Covarrubias also complained that the cell housing areas were only being swept and mopped, albeit with "heavily soiled mops." Surface areas such as tables, stools, walls, and rails were only infrequently wiped, and then only with a damp rag. The grievance responses acknowledge that areas should be supervised for cleanliness, but they are not. Covarrubias complains that Dewberry and other officials have allowed subordinates to continue a practice that maintains a minimal level of sanitation; he speculates that a written or unwritten policy exists restricting the amount of chemicals available, with the primary consideration being budgetary. As Defendants in this claim, Covarrubias named "Defendant Dewberry and/or John Doe official overseeing sanitation" for "deliberate indifference to health of inmates; negligent enforce [sic] policy" and "Defendant(s) Doe,

7

policymakers/enforcers/implementers" for "deliberate indifference fail to take needed steps to maintain healthy [sic]."

The Magistrate Judge determined that Covarrubias did not show any harm resulting from the alleged sanitation conditions of which he complains, other than a reference to a rash for which he acknowledges that he did not seek medical care and which apparently cleared up on its own. In his objections, Covarrubias states that "an inmate need not seek medical attention especially when he has no confidence that appropriate treatment will be provided or that a diagnosis as to the origin and cause of the rash will be made." He argues that the rash persisted for some two months and eventually cleared up due to "a course of self-treatment." The Magistrate Judge properly concluded that Covarrubias did not show anything more than *de minimis* harm. *See, e.g.*, *Gins v. J.B. Evans Correctional Center*, civil action no. 08-1475, 2009 U.S. Dist. LEXIS 4880, 2009 WL 196199 (W.D. La., January 23, 2009) (development of non-specific rash as a result of being forced to take cold showers was a *de minimis* injury); *Myers v. Valdez*, civil action no. 3:05cv1799, 2005 U.S. Dist. LEXIS 28569, 2005 WL 3147869 (N.D.Tex., November 17, 2005, *Report adopted* November 30, 2005) (allegations of pain, numbness in extremities, loss of mobility, lack of sleep, extreme tension in neck and back, extreme rash, and discomfort were insufficient to show a "physical injury" for purposes of the Prison Litigation Reform Act).

Covarrubias also argues that the practice of permitting only infrequent cleaning of the housing areas amounted to deliberate indifference. However, he alleges no facts showing that any of the individuals named in connection with the claim, even the "John Doe" defendants, acted with deliberate indifference rather than merely negligence. *See Flores v. TDCJ Transitorial Planning Department, Southern Region Institutional Division, et al.*, slip op. no. 2:14cv283, 2015 U.S. Dist. LEXIS 77194, 2015 WL 5554630 (S.D.Tex., June 15, 2015), *Report adopted in pertinent part at* 2015 U.S. Dist. LEXIS 125399, 2016 WL 879831 (September 21, 2015); *Holder v. Hebert*, civil action no. 07-1206, 2007 U.S. Dist. LEXIS 93972, 2007 WL 4299996 (W.D.La., November 8,

2007), *Report adopted at* 2007 U.S. Dist. LEXIS 89042 (W.D.La., December 4, 2007). These objections are without merit.

**V. Maintenance**

Covarrubias states that he filed grievances concerning the lack of maintenance, which tied in with the sanitation problems. He made complaints of no in-cell hot water, rusted fixtures, missing window screens, single electrical outlets in cells (which were not adequate for use by two people), missing locker doors, porous shower walls, poorly ventilated showers with no lights and no drain grates or stopped-up drains, and in-cell vents that are clogged or barely functioning. He speculates that TDCJ has an official policy of maintaining the complained-of areas in disrepair and claims that unknown defendants, as well as maintenance supervisors Richard Mills and Regina Oliver, have "created, implemented or enforced a practice of allowing unsafe and unhealthy circumstances to continue to the extent that basic human needs are compromised." He filed grievances and was told that work orders were opened on the matters about which he complained.

The Magistrate Judge determined that Covarrubias failed to identify any cognizable harm suffered from the alleged lack of maintenance and that he offered nothing beyond bald conclusions to suggest that the named defendants were deliberately indifferent to his safety.

Covarrubias objects that his contentions regarding maintenance are "sufficiently specific and correct" and asserts that these claims "encompass a broader range," such as ventilation, hot water, and vermin infestations. He also maintains that the physical injury requirement does not apply to requests for declaratory or injunctive relief. Covarrubias argues that if a condition persists for a long period of time and is not remedied, this is the equivalent of deliberate indifference.

The Fifth Circuit has stated that the failure to remain vigilant in maintaining safe prison environments may rise to the level of negligence, but does not by itself amount to deliberate indifference. *See West v. Blair,* 254 F.3d 1081, 2001 U.S.App. LEXIS 31046, 2001 WL 563818 (5th Cir, May 15, 2001), *citing Neals v. Norwood,* 59 F.3d 530, 533 (5th Cir.1995). Covarrubias has not shown that any of the named Defendants knew of and disregarded a substantial risk of serious harm.

*See, e.g., Franco–Calzada v. United States,* 375 F.App'x 217, 2010 U.S.App. LEXIS 6219, 2010 WL 1141384 (3rd Cir., March 25, 2010) (failure to inspect and fix faulty ladder attached to prison bunk bed was negligence which did not rise to the level of an Eighth Amendment deliberate indifference claim); *Benson v. Cady,* 761 F.2d 335, 339–40 (7th Cir.1985) (prison officials' failure to inspect and maintain cell beds and exercise equipment which fell and injured prisoner in two separate incidents was at most a lack of due care which failed to demonstrate deliberate indifference to an unreasonable risk of harm posed by the inmate's physical environment). Even if the Defendants should have conducted safety inspections but failed to do so, this fact would not demonstrate an Eighth Amendment violation through deliberate indifference. *West,* 2001 U.S.App. LEXIS 31046 at *5; *Benson,* 761 F.2d at 340. The Magistrate Judge correctly concluded that Covarrubias failed to show deliberate indifference with regard to his maintenance claims. His objections in this regard are without merit.

## VI. Law Library Policies

Covarrubias asserts that the law library seats 45 people, who are seated immediately to the left and right and directly in front of one another. The tables are not partitioned, and each inmate has the space equivalent to an open book and a writing pad.

As a result, Covarrubias states that inmates, who attend the law library sessions with "various agendas," are often able to read and see what other prisoners are working on. He complains that while relevant precedent permits the forfeiture of certain privacy rights, "other law also imposes a duty on the prisons to protect the rights of its wards from being breached by non-official persons." When he filed grievances, the prison officials responded that adequate space is provided and the law library is a public place, thus suggesting that "voluntary participation is a forfeiture of privacy /confidentiality." Covarrubias received a disciplinary case for moving from one seat to another one where inmates were not in direct proximity to him. He complains that law library officer Keisha Stotts and other unknown defendants "continued with a practice that failed to accommodate for privacy and confidentiality in personal legal matters or materials."

10

Covarrubias further complained that: the law library does not provide adequate access because some of the research items are not provided or are so inefficient as to be useless; time in the law library is limited to 10 to 14 hours a week, which in practice amounts to 8 ½ to 12 ½ hours because of delays; and, he had only "indirect access" to the law library while confined in close custody between June of 2013 and October of 2014, which sharply cut back on the quantity and quality of access he received. As a result, Covarrubias states that he was unable to research state tort law so as to which court has venue, what is the filing fee, whether proceeding not *in forma pauperis* avoids a 31 day limitations period, whether violations of TDCJ rules can receive judicial review, whether rule violations that are contrary to statutory law can give rise to a cause of action, and what, if any, state constitutional laws protect inmates when the federal constitution is not implicated. He contended this hampered his ability to present a cause of action in state court.

The Magistrate Judge determined that no case in any state or federal jurisdiction has held that prisoners have a right of privacy in their law library work from other prisoners sitting nearby and that there is no constitutional obligation to place partitions on law library desks to protect inmates from potentially having their legal work seen by other prisoners. The Magistrate Judge further stated that Covarrubias failed to show sufficient harm as required to set out a constitutional claim; he offered nothing to suggest that his putative tort claim was potentially meritorious or represented a challenge to his sentence or the conditions of his confinement, his previously federal lawsuit resulted in a jury trial, and Covarrubias has been consistently able to file numerous pleadings, motions, and other documents.

Covarrubias objects that "a probability exists that without the TDCJ's enforcement authority, Covarrubias will involuntarily have exposed confidential legal matters to other offenders" and it is the duty of the Agency to ensure that privacy and confidentiality are assured. He argues that he needed "immediate access" to legal materials in order to respond to court orders and that many of the documents he filed lacked supporting case law or statutory references. Covarrubias contends that while on indirect access, the provision of three cases three times a week, without the aid of self

help books or pamphlets, makes getting into court difficult. The Magistrate Judge correctly determined that no precedent exists for Covarrubias' invocation of privacy rights in his legal materials in the law library and that no such constitutional right exists.

The Magistrate Judge also concluded that Covarrubias did not show constitutionally cognizable harm in regard to his claims of denial of access to legal materials. Covarrubias maintains in his objections that a law library is essential to framing adequate court documents and that there were often periods of time when he had objections or responses to court orders due. He states it was therefore necessary that he have immediate access to digest volumes.

Covarrubias asserts that some case law is not available in the law library and that the lack of access to digests causes hin to be unable to discover new theories or to test old theories. There are no duplication or printing services available to prisoners and very few encyclopedias, treatises, or practice guides.

Although the Magistrate Judge listed a number of court proceedings in which Covarrubias participated *pro se*, Covarrubias argues that a number of the documents he filed lacked supporting case law or statutory references. In addition, a number of the claims raised in his prior lawsuit were dismissed and his arguments on appeal lacked substance and authority because he could not discover Fifth Circuit cases or research legal theories. He states that had he not been appointed an attorney, he could not have presented his claims. Even inmates experienced in research like himself have a hard time determining the viability of claims, making adequate responses, or even responding in a timely manner.

Similarly, Covarrubias states that while he was placed on indirect access to the law library, he tried to research state tort law to determine the viability of a claim against TDCJ officials for using restraining devices on him which left notable bruising for about a week. He was unsure as to the nature of such a claim, the proper state court in which to file, the filing fee, the statute of limitations, and other legal questions. He does not indicate whether or not he ever filed his putative tort claim.

The Fifth Circuit has explained as follows:

> Prisoners have a constitutional right to access the courts. *See Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1976). However, the Supreme Court's decision in Bounds did not establish that prisoners have a right to a law library or legal assistance. *See Lewis v. Casey*, 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Rather, 'prison law libraries and legal assistance programs are not ends in themselves, but only the means for assuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' *Id*. at 351, 116 S.Ct. 2174 (quoting *Bounds*, 430 U.S. at 825, 97 S.Ct. 1491). Therefore, a prisoner alleging a violation of *Bounds* must allege an actual injury.

*Mendoza v. Strickland*, 414 F.App'x 616, 2011 U.S. App. LEXIS 2257, 2011 WL 396478 (5th Cir., February 3, 2011); *see also Mann v. Smith*, 796 F.2d 79, 83 (5th Cir. 1986). In this regard, the U.S. Supreme Court has provided examples of what constitutes an "actual injury":

> [The inmate] might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered some arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Lewis*, 518 U.S. at 351; *see also McIntosh v. Thompson*, 463 F.App'x 259, 2012 U.S. App. LEXIS 3711, 2012 WL 602437 (5th Cir., February 24, 2012) (even if destruction of inmate's legal paperwork restricted his constitutional rights, he failed to allege an injury in fact, which is required to state a claim for denial of meaningful access to the courts).

This right to access the courts "rest[s] on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415, 122 S.Ct. 2179, 2186-87, 153 L.Ed.2d 413 (2002). A plaintiff complaining of loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief must describe the predicate claim [i.e. the underlying case for which access to courts is sought] well enough to show the claim is not frivolous and the arguable nature of this claim amounts to "more than hope." *Id.*, 536 U.S. at 415; *see also Lewis*, 518 U.S. at 353 and n. 3 (actual injury requires the underlying claim for which access to court was allegedly denied be arguable and non-frivolous; depriving

13

someone of a frivolous claim "deprives him of nothing at all, except perhaps the punishment of Rule 11 sanctions.")

Covarrubias has failed to show that he suffered actual harm as a result of the alleged limitations placed on his access to court. He does not describe his putative tort claim well enough to show it was not frivolous or that the arguable nature of the claim amounted to more than hope. *See Minix v. Stoker*, 289 F.App'x 15, 2008 U.S. App. LEXIS 15541, 2008 WL 2796730 (5th Cir., July 21, 2008) (plaintiff's access to courts claim failed because he did not show that the defendants' acts prejudiced his position in a specific suit), *citing McDonald v. Steward*, 132 F.3d 225, 230-31 (5th Cir. 1998).

In Covarrubias' previous federal lawsuit, an evidentiary hearing was conducted, counsel was appointed to represent him, he had a jury trial, he filed a lengthy and detailed *pro se* motion for new trial, he filed a 29 page brief with the Fifth Circuit in support of his motion to proceed *in forma pauperis* which contained citations to some 50 different cases, he filed a motion for rehearing in the Fifth Circuit, and he sought certiorari review with the U.S. Supreme Court. Covarrubias plainly was not denied access to court with respect to this litigation. *Mann*, 796 F.2d at 83 (prisoner was not denied access to court where he filed a detailed complaint along with an application for leave to proceed *in forma pauperis*, the defendants were served, discovery proceeded, and amended his complaint to state additional claims and seek additional relief). Covarrubias' objections in this regard are without merit.

**VII. Harassment and Retaliation**

Covarrubias states that law library officers Keisha Stotts, Lashun Randle, and Melvin McCray denied him law library sessions or legal material requests in order to harass him. He maintains that the officers made comments about his grievances in sarcastic tones, wished he would go back to the Beto Unit, and denied law library sessions or extra time. He acknowledges, and law library records confirm, that he received 10 to 14 hours per week of law library access.

The Magistrate Judge stated that prisoners do not have a right to unlimited law library time and that Covarrubias did not show any harm as a result of the denials complained of. In his objections, Covarrubias argues that he should not have to show harm in order to maintain a retaliation claim and that he did not violate law library when he moved from one seat to another to protect his privacy.

The Fifth Circuit has stated that *de minimis* acts of retaliation do not satisfy the "retaliatory adverse act" prong of a retaliation claim. *Morris v. Powell*, 449 F.3d 682, 684-85 (5th Cir. 2006). In the absence of a showing of cognizable harm, Covarrubias has not demonstrated anything more than *de minimis* acts of retaliation.

The prison records show, and Covarrubias does not dispute, that on one occasion in February of 2012, he was assigned to seat no. 11 but moved to seat no. 39, for which he received a disciplinary case. Although Covarrubias offers the conclusory assertion that Stotts "took the additional step of commencing a disciplinary report which was motivated not by the actual violation itself but her long abiding dislike of plaintiff by retaliation for his use of the grievance mechanism," he offers nothing to support the claim that but for the alleged retaliatory motive, he would not have received disciplinary action. The Magistrate Judge properly determined that Covarrubias failed to show that his receipt of a disciplinary case was the result of retaliatory animus rather than the fact that he changed seats without permission.

Covarrubias also complained of an incident involving Sgt. Purvis, in which Purvis was escorting seven inmates, including Covarrubias, from Three Building to Seven Building after a recreation period was cut short. Some of the other inmates in the group tried to resolve the situation with Officers Rickman and Brookins, but Purvis intervened, saying "if anyone has a problem with it, talk to me, you shouldn't have come to the penitentiary." When the inmates tried to talk to Purvis, the officer became angry and grabbed one of them, threatening to lock him up.

Covarrubias contended that he had a legitimate complaint but Purvis' actions intimidated him into silence. He resolved not to attempt informal resolution of problems with officers like Purvis,

15

whom Covarrubias said is known to be "aggressive, offensive, and impulsive." Although Covarrubias couched this as a retaliation claim, the Magistrate Judge determined that Covarrubias did not identify a specific constitutional right which he was attempting to exercise or show that Purvis was retaliating against him. Nor did he show that but for a retaliatory motive by Purvis against Covarrubias, the incident would not have occurred. The Magistrate Judge further stated that to the extent a display of temper by Purvis against other inmates could be considered an act of retaliation against Covarrubias, such an act would be *de minimis*

In his objections, Covarrubias argues that the constitutional right alleged is the right to be free from adverse acts which chill or silence redress of grievances. He states that he anticipated using the informal resolution procedure to address the improper recreation limitation, hoping that Purvis would acknowledge that the recreation period had been cut short and somehow remedy the misconduct. However, Purvis "defeated informal resolution from its inception" by threatening to lock up another prisoner who complained. Covarrubias states that Purvis directed his words and actions at the group including him, which had the same chilling effect with respect to informal resolution as if Covarrubias himself had experienced the assault.

According to Covarrubias, Purvis recognized that his actions were unauthorized by denying that he physically assaulted another inmate or that any unethical behavior occurred. According to Covarrubias, these denials suggest that his actions were improper and his motives were questionable. He insists that Purvis' threats to lock up the inmate who complained were not *de minimis*, but were "objectively enough to chill any further redress including that by Covarrubias."

The fact that Purvis yelled at and threatened another inmate cannot be construed as retaliation against Covarrubias, who had not yet spoken up. Retaliation is a response to an action which has already occurred and cannot be a response to an action that has not yet occurred. *Morgan v. Denton Independent School District*, civil action no. 4:12cv290, 2013 U.S. Dist. LEXIS 115121, 2013 WL 4418447 (E.D.Tex., August 15, 2013). Purvis' yelling and threatening also does not set out a constitutional claim because the Fifth Circuit has stated that mere threatening language and

16

gestures of a custodial officer do not, even if true, amount to constitutional violations. *Bender v. Brumley*, 1 F.3d 271, 274 n.3 (5th Cir. 1993); *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983). Covarrubias cannot evade this rule by arguing that the threatening language and gestures were meant to retaliate against him or prevent him from seeking informal resolution even though he had not yet done so. Covarrubias' objections in this regard are without merit.

**VIII. Strip Searches**

Covarrubias states that in April of 2013, he arrived at 10 Building only to see other inmates being strip searched prior to entering the law library. There were two or three male officers present as well as a female officer named Brenda Mapps. The male officers had stripped two male prisoners naked.

Two more female officers arrived and Mapps began participating in the searches, no longer acting as security only. Covarrubias tried to leave to avoid being strip searched by a female, but Mapps prohibited him from doing so. She ordered him to strip down to his boxers and directed him to open his boxers in the front, allowing her to view his genitals. Mapps had him turn around and do the same so that she could view his buttocks as part of the search.

The Magistrate Judge recommended that Covarrubias' claim against Mapps go forward; nonetheless, Covarrubias discusses this incident at length in his objections. Covarrubias also states that prison officials should consider the presence of "criminally minded homoerotic persons" and that the Court should hold that "public searches in a less than private manner in the prison context, given contemporary standards and the prevalence of homoeroticism at the Michael Unit, offends inmates' constitutional right to privacy." No case has held that the possible presence of homosexuals, whether inmates or staff, gives rise to heightened privacy rights on behalf of other prisoners being strip searched. The Fifth Circuit has consistently held that strip searches may be conducted in public, even in the presence of female guards, if the presence of the female officers is required to protect a legitimate governmental interest such as maintaining security. *Johnson v. Rupert*, civil action no. 14-41452, U.S. App. LEXIS 7963, 2016 WL 1743070 (5th Cir., May 2,

2016), *citing Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir. 1992); *see also Tuft v. Texas*, 410 F.App'x 770, 2011 U.S. App. LEXIS 434 (5th Cir., January 7, 2011), *citing Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002). Covarrubias' objections in this regard are without merit.

## IX. Conclusion

The Court has conducted a careful *de novo* review of those portions of the Magistrate Judge's proposed findings and recommendations to which the Plaintiff objected. *See* 28 U.S.C. §636(b)(1) (district judge shall "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.") Upon such *de novo* review, the Court has determined that the Report of the Magistrate Judge is correct and the Plaintiff's objections are without merit. It is accordingly

**ORDERED** that the Plaintiff's objections are overruled and the Report of the Magistrate Judge (docket no. 59) is **ADOPTED** as the opinion of the District Court. It is further

**ORDERED** that all of the Plaintiff's claims except for his complaint about the strip search allegedly carried out by Officer Mapps on April 9, 2013 and exposure to excessive heat be dismissed with prejudice as frivolous and for failure to state a claim upon which relief may be granted. It is further

**ORDERED** that the Plaintiff's second motion for reconsideration (docket no. 49) is **GRANTED** as to the Plaintiff's claim that he was subjected to cruel and unusual punishment through sleep deprivation. The dismissal of this claim is set aside and the claim is reopened. Covarrubias does not name any particular individual or individuals in connection with this claim but merely says that "the Administration has told him that inmates are not entitled to adequate uninterrupted sleep of eight hours;" accordingly, the Court will direct that Warden Todd Foxworth answer this claim.

**So Ordered and Signed**
**Sep 14, 2016**

*[signature]*

Ron Clark, United States District Judge